# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

F.H.G. CORPORATION d/b/a CAPSTONE NUTRITION,

    Plaintiff,

v.

MUSCLEPHARM CORPORATION,

    Defendant.

## COMPLAINT

### Jury Trial Demanded

Plaintiff F.H.G. Corporation d/b/a Capstone Nutrition ("Capstone"), by its undersigned attorneys, as and for its complaint against Defendant MusclePharm Corporation ("MusclePharm") respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a straightforward breach of contract case. MusclePharm and Capstone are parties to a manufacturing agreement under which Capstone manufactured certain sports nutritional products for MusclePharm. MusclePharm ordered and accepted delivery on tens of millions of dollars of product. Upon information and belief, MusclePharm then turned around and sold that product to its customers. Yet, MusclePharm has failed to live up to its contractual commitments to Capstone under the manufacturing agreement in multiple ways.

2. Despite accepting delivery of the product manufactured by Capstone, MusclePharm owes Capstone over $22.5 million in accounts receivable plus contractual interest. During the course of the parties' business relationship, MusclePharm has essentially turned Capstone into its bank. MusclePharm ordered product and expected Capstone to manufacture and deliver it, while at the same time ignoring its 60-day payment terms for previously ordered product and falling further and further into debt. Capstone had to repeatedly chase MusclePharm to get it to pay even the smallest amounts of money. Capstone tried to work with MusclePharm for the better part of a year to solve this problem, but the result was MusclePharm's debt growing out of control, with no plan to get current.

3. MusclePharm also agreed to purchase certain minimum volumes of product from Capstone. Indeed, Capstone spent roughly $10 million dollars building out a manufacturing facility in Tennessee that would focus on meeting MusclePharm's capacity needs. Again, MusclePharm fell well-short of meeting its contractual obligations. In the third and fourth quarters of 2015 alone, MusclePharm missed its minimum volume requirements by over $12 million. These requirements continue over the term of the manufacturing agreement, and total damage to Capstone for its profits on these contractually mandated amounts is in excess of $40 million over that term.

4. Finally, MusclePharm has refused to accept delivery of and pay for certain finished goods. These are products that Capstone manufactured under purchase orders from MusclePharm. Once made, however, MusclePharm did not accept delivery and had Capstone hold the product in inventory. After repeated inquiries by Capstone, including

notice that Capstone would liquidate this inventory, MusclePharm cherry-picked a limited amount of product for delivery and paid for it. Capstone is in the process of liquidating the remainder and is seeking the difference between the money owed under the contract for this product and the liquidation price.

5. MusclePharm's breaches of the manufacturing agreement have caused significant damage to Capstone, totaling over $65 million in contractual damages, as well as reasonable attorney fees and court costs.

## THE PARTIES

6. Capstone is one of the largest non-branded contract manufacturers of health and dietary supplements in the United States. It is a Florida corporation with a principal place of business in Ogden, Utah (formerly in Spring Hill, Tennessee).

7. MusclePharm is a leading sports nutrition brand that develops, markets, and distributes sports nutritional supplements. It is a Nevada corporation with a principal place of business in Denver, Colorado.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

9. This Court has personal jurisdiction over MusclePharm because its principal place of business is within this District.

10. In addition, pursuant to Section 19.4 of the parties' contract, MusclePharm has submitted to this Court's jurisdiction and has agreed to apply the laws of Colorado and the United States, regardless of conflict of laws.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) because MusclePharm resides in this District.

12. Prior to initiating suit, Capstone complied with the requirements under Section 15 of the parties' agreement.

## FACTUAL ALLEGATIONS

### A. *The Parties' Manufacturing Agreement*

13. On November 27, 2013, Capstone and MusclePharm entered into a manufacturing agreement (the "Manufacturing Agreement"), under which Capstone would manufacture and deliver certain sports nutrition products ordered by MusclePharm. A copy of the Manufacturing Agreement is attached as Exhibit A.

14. On March 2, 2015, the parties entered into the First Amendment to the Manufacturing Agreement (the "First Amendment" and collectively with the Manufacturing Agreement, the "Agreement."). A copy of the First Amendment is attached as Exhibit B.

15. As a result of the First Amendment, the parties' contractual relationship was extended for seven additional years, while also providing Capstone with the unilateral ability to extend the agreement for a further six years by way of three successive two year extension options. Ex. B at § 3.

4

16. Pursuant to the Agreement, the manufacturing and sales process would begin with MusclePharm issuing a binding purchase order to Capstone on the first day of each month covering that month's product[1] purchases as well as the purchases for the two subsequent months. *Id.* at § 4. MusclePharm's requested delivery dates would be subject to "reasonable lead times," *id.*, allowing Capstone time to obtain the necessary ingredients, test the ingredients, and mix the ingredients.

17. Once Capstone delivered the product, MusclePharm was required to pay in full within 60 days. *Id.* at § 5.2. If MusclePharm failed to pay on time, payments in arrears would accrue interest at 1.5% per month. *Id.* In addition, Capstone would be "under no obligation to accept orders form MusclePharm or to ship on accepted orders if any payment is in arrears." *Id.* Further, MusclePharm would be required to "pay all costs associated with the collection of any past due invoice including reasonable attorney fees and court costs." *Id.*

18. Pursuant to Section 2.1 of the Agreement, MusclePharm was required to "purchase and take delivery" of the following minimum volumes:

(i) "not less than $67,500,000 of Products in calendar year 2015 (priced in accordance with Section 5), provided that of that volume, not less than $19,500,000 shall be purchased in the third calendar quarter and

---

[1] "Products" are defined in Section 1(e) of the Agreement as "dietary supplements (as defined in Section 1.2 of the [2014] Agreement) and food products that are sold or intended to be sold by MusclePharm or its customers or distributors in powder, pill, tablet, or capsule form, and including both finished (packaged) goods and bulk or semi-finished form for export by MusclePharm."

    not less than $21,500,000 shall be purchased in the fourth calendar quarter"

 (ii) "not less than $23,500,000 of Products in the first quarter of calendar year 2016 (priced in accordance with Section 5)"

 (iii) "not less than $25,500,000 of Products in the second calendar quarter of 2016 (priced in accordance with section 5)"

 (iv) "for each subsequent calendar quarter during the Term, the greater of $90,000,000 of Products in aggregate over that quarter and the past three calendar quarters or 90% of MusclePharm's requirements for its Products in that quarter and the past three calendar quarters (by aggregate purchase price)."

Ex. B at § 2.1.

19. Though permitted to revise or cancel a purchase order or eliminate any product ingredient, Ex. A. at § 4, MusclePharm remained obligated to satisfy these minimum volume requirements. Moreover, MusclePharm would remain liable for all costs associated with any revisions or cancellations that Capstone could not offset using commercially reasonable efforts. *Id.*

### B. MusclePharm Has Been In Arrears for Virtually The Entire Contract Term

20. Throughout the contract period, Capstone manufactured and delivered products to MusclePharm.

21. MusclePharm accepted delivery of these products.

22. Upon information and belief, MusclePharm sold these products to its customers.

23. MusclePharm, however, regularly failed to pay Capstone for this product at all, let alone within the 60-day term under the contract. Indeed, MusclePharm has been in arrears for virtually the entirety of the parties' business relationship.

24. MusclePharm, however, became current with its arrears at the end of February 2015 so that it could enter into the First Amendment on March 2, 2015. But once the First Amendment was signed, MusclePharm immediately fell back into arrears.

25. By the end of March 2015, MusclePharm was again over one million dollars in arrears. This amount consistently grew over time as MusclePharm's failure to pay for its orders continued.

26. Throughout the contract period, Capstone repeatedly tried to work with MusclePharm to resolve the ever-growing arrears. MusclePharm assured Capstone that it was implementing a new restructuring plan that would allow it to clear the arrears. No such plan ever materialized.

27. MusclePharm also insisted that it was on the verge of obtaining a credit facility which would also enable it to clear the arrears. No such credit line ever materialized.

28. Capstone even arranged its own payment plan with MusclePharm—but MusclePharm missed those payments too.

29. In total, MusclePharm's arrears amount to over $22.5 million. This amount accrues contractual interest at 1.5% per month from the time payment was due. *See* Ex. B at § 5.2.

### C. *MusclePharm Failed To Purchase The Agreed Minimum Amount Of Product*

30. MusclePharm also failed to meet its minimum purchase obligations imposed by Section 2.1.

31. The parties carefully negotiated these minimum purchasing amounts as part of the First Amendment. To cope with the increased volume, the parties agreed that an expansion of Capstone's Tennessee facility was "necessary to fulfill anticipated MUSCLEPHARM requirements under this Agreement." Ex. B at § 11. Capstone spent $10 million on the expansion, and MusclePharm contributed $2.5 million. *See id.*

32. The Agreement's volume requirements required MusclePharm to purchase and take delivery of at least $19.5 million of product in the third quarter and $21.5 million of product in the fourth quarter of 2015. *Id.* at § 2.1.

33. MusclePharm fell significantly short of these requirements, purchasing only $16.3 million of product in the third quarter of 2015 and $12.3 million of product in the fourth quarter of 2015.

34. The parties' minimum volume requirements continue to exist in 2016 and beyond, and have similarly not been met. Indeed, MusclePharm is not currently purchasing *any* product from Capstone and is instead purchasing product from other manufacturers.

35. MusclePharm's failure to satisfy the contractual minimum volume requirements has resulted in Capstone's loss of at least $40 million in profits over the regular term of the Agreement.

### D. *MusclePharm Has Failed To Accept Delivery Of Some Orders*

36. MusclePharm has also failed to take possession of products that Capstone manufactured pursuant to MusclePharm's purchase orders. After Capstone manufactured the product for these orders, MusclePharm requested that Capstone hold the products at Capstone's facility.

37. Capstone initially accommodated MusclePharm's request, but reached the point where it could no longer inflate its own inventory. Capstone repeatedly communicated this to MusclePharm and explained that pursuant to Section 4 of the Agreement, it was required to make "commercially reasonable" attempts to reduce the amount owed.

38. Capstone informed MusclePharm of its intention to liquidate the abandoned inventory, and offered MusclePharm another opportunity to pay for and accept delivery of the product. MusclePharm chose to take delivery of only a limited amount of product, discarding the rest.

39. Capstone is in the process of liquidating the remaining inventory and is seeking the difference between the contract price and the liquidation price.

### E. *MusclePharm's Breaches Have Harmed Capstone's Business*

40. In addition to the above harms, MusclePharm's failure to satisfy its contractual obligations has negatively impacted Capstone's business generally—

particularly since, to satisfy the requirements of the Agreement, Capstone had to devote a substantial amount of its production capacity exclusively to MusclePharm.

41. Because of MusclePharm's arrears, Capstone encountered difficulty paying its suppliers, many of whom began to insist on prepayment from Capstone before shipping materials.

42. As MusclePharm's debt to Capstone increased, Capstone became more indebted to its suppliers. For example, from February 2015 to September 2015, Capstone's payables more than 30 days past due soared from approximately $2.26 million to $13.1 million.

43. Indeed, there were times when Capstone was forced to choose between paying its suppliers and making payroll to its employees.

44. MusclePharm's arrears also impacted Capstone's ability to obtain financing, since Capstone's credit facility only allows it to borrow against balances that are current. This reduced borrowing base hindered Capstone's ability to obtain ingredients for all customers, including MusclePharm.

## CLAIMS FOR RELIEF

### Count 1: Breach of Contract Relating to Arrears

45. Capstone alleges and incorporates by reference each and every allegation above as if fully set forth herein.

46. Capstone manufactured and delivered products that MusclePharm ordered and for which MusclePharm accepted delivery.

47. MusclePharm breached the Agreement by not paying for substantial amounts of these products.

48. MusclePharm is currently in arrears in excess of $22.5 million for these products.

49. Capstone is entitled to contractual interest on past due amounts at a rate of 1.5% per month.

### Count 2: Breach of Contract Relating to Minimum Volume Requirements

50. Capstone alleges and incorporates by reference each and every allegation above as if fully set forth herein.

51. The Agreement contains minimum volume requirements for each year of the contract term (and in some cases, on a quarterly basis).

52. MusclePharm has failed to satisfy the minimum volume requirements, thereby breaching the Agreement.

53. MusclePharm's failure to satisfy the contractual minimum volume requirements has cost Capstone in excess of $40 million in lost profits.

### Count 3: Breach of Contract Relating to Product Inventory

54. Capstone alleges and incorporates by reference each and every allegation above as if fully set forth herein.

55. Having manufactured products to satisfy MusclePharm's orders, Capstone initially agreed to accommodate MusclePharm when it requested that Capstone hold on to the products for a short time.

56. Capstone is no longer in a position to house product evidently abandoned by MusclePharm.

57. Capstone has communicated this to MusclePharm repeatedly and yet MusclePharm continues to refuse delivery of certain of its products.

58. MusclePharm, therefore, breached the Agreement by refusing to accept delivery of and pay for this product.

59. Capstone is in the process of liquidating this product and is seeking the difference between the contract price and the liquidation price of this abandoned product.

### Count 4: Attorney Fees and Court Costs

60. Pursuant to the Agreement, MusclePharm "shall pay all costs associated with the collection of any past due invoice including reasonable attorney fees and court costs." Ex. B at § 5.2.

61. Capstone has incurred significant costs in pursuing MusclePharm for its failure to pay. After attempting to resolve the matter by working with MusclePharm to resolve the arrears for over one year, it became clear that Capstone would need to seek relief in an adversarial setting.

62. As the Agreement required, Capstone first attempted to resolve the dispute through mediation—but mediation did not produce a settlement and Capstone initiated this suit. In attempting to recover payment for the above breaches through mediation and now litigation, Capstone has incurred legal costs and fees which MusclePharm is required to pay pursuant to the Agreement.

**Request for Relief**

Accordingly, Capstone requests that this Court grant the following relief:

a. Enter judgment in favor of Capstone on Count 1 requiring MusclePharm to pay damages in an amount in excess of $22.5 million plus contractual interest, the precise amount to be determined;

b. Enter judgment in favor of Capstone on Count 2 requiring MusclePharm to pay damages in excess of $40 million, the precise amount to be determined;

c. Enter judgment in favor of Capstone on Count 3 requiring MusclePharm to pay damages equal to the difference between the contract price and the liquidation price of the liquidated product, the precise amount to be determined;

d. Enter judgment in favor of Capstone on Count 4 requiring MusclePharm to pay Capstone's attorney fees and court costs, the precise amount to be determined;

e. Award pre-judgment interest on all amounts owed;

f. Granting such other and further relief as this Court may deem just and proper;

g. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Capstone demands a trial by jury.

Dated:  May 16, 2016

                    Respectfully submitted,

                    WEIL, GOTSHAL & MANGES LLP

                    /s/ *David L. Yohai*
                    David L. Yohai
                    767 Fifth Avenue
                    New York, New York 10153
                    Tel.: (212) 310-8000
                    Fax: (212) 310-8007
                    David.Yohai@weil.com

                    *Attorneys for Plaintiff F.H.G. Corporation d/b/a Capstone Nutrition*