# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01135-KLM

F.H.G CORPORATION d/b/a CAPSTONE NUTRITION,

      Plaintiff and Counterclaim-Defendant,

v.

MUSCLEPHARM CORPORATION,

      Defendant and Counterclaim-Plaintiff,

v.

INI PARENT, INC. and
MEDLEY CAPITAL CORPORATION,

      Counterclaim-Defendants.

---

## MUSCLEPHARM CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

---

Defendant MusclePharm Corporation ("MusclePharm"), as and for its Answer, Affirmative Defenses and Counterclaim to the Complaint of Plaintiff F.H.G. Corporation d/b/a Capstone Nutrition ("Capstone"), states as follows:

### <u>ANSWER AND AFFIRMATIVE DEFENSES</u>

As and for its Answer and Affirmative Defenses to Capstone's Complaint, MusclePharm states as follows:

1.      MusclePharm admits that the parties entered into a written manufacturing agreement (the "Manufacturing Agreement"); refers to that agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 1.

2.     MusclePharm denies the allegations in Paragraph 2.

3.     MusclePharm admits that the parties entered into the Manufacturing Agreement; refers to that agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 3.

4.     MusclePharm admits that it paid for certain product in Capstone's inventory; states that Capstone failed to supply all of such product; further states that, to the extent MusclePharm refused to accept delivery of any other product in Capstone's inventory, such refusal was a direct result of Capstone's breaches of its obligation timely to supply product under the Manufacturing Agreement; and otherwise denies the allegations in Paragraph 4.

5.     MusclePharm denies the allegations in Paragraph 5.

6.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.

7.     MusclePharm admits the allegations in Paragraph 7.

8.     Paragraph 8 asserts a legal conclusion to which no response is required; MusclePharm otherwise denies the allegations in Paragraph 8.

9.     Paragraph 9 asserts a legal conclusion to which no response is required; MusclePharm otherwise denies the allegations in Paragraph 9.

10.     MusclePharm refers to the referenced agreement for its true and complete terms; states that Paragraph 10 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 10.

11.     Paragraph 11 asserts a legal conclusion to which no response is required; MusclePharm otherwise denies the allegations in Paragraph 11.

12.     Paragraph 12 asserts a legal conclusion to which no response is required; MusclePharm otherwise admits the allegations in Paragraph 12.

13.     MusclePharm admits that, on or about November 27, 2013, the parties entered into the Manufacturing Agreement; refers to that agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 13.

14.     MusclePharm admits that, on or about March 2, 2015, the parties entered into an amendment to the Manufacturing Agreement; refers to that amendment for its true and complete terms; and otherwise denies the allegations in Paragraph 14.

15.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 15.

16.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 16.

17.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 17.

18.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 18.

19.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 19.

20.     MusclePharm admits that Capstone from time to time manufactured and delivered products to MusclePharm; and otherwise denies the allegations in Paragraph 20.

21.     MusclePharm admits that MusclePharm accepted delivery of certain of the products Capstone manufactured; and otherwise denies the allegations in Paragraph 21.

22.     MusclePharm admits that MusclePharm sold to its customers certain of the products Capstone manufactured; and otherwise denies the allegations in Paragraph 22.

23.     MusclePharm denies the allegations in Paragraph 23.

24.     MusclePharm admits that it was current in its payments to Capstone at the end of February 2015 and as of March 2, 2015; and otherwise denies the allegations in Paragraph 24.

25.     MusclePharm admits it owed Capstone over one million dollars by the end of March 2015; states that this amount relates to product that Capstone delivered late, in violation of the Manufacturing Agreement; and otherwise denies the allegations in Paragraph 25.

26.     MusclePharm admits that, throughout the contract period, MusclePharm has repeatedly tried to work with Capstone to resolve the parties' differences, but that Capstone has refused to do so; admits that it is in the process of implementing a restructuring plan; and otherwise denies the allegations in Paragraph 26.

27.     MusclePharm states that it obtained a credit facility in January 2016; and otherwise denies the allegations in Paragraph 27.

28.     MusclePharm states that throughout the contract period, MusclePharm has repeatedly tried to work with Capstone to resolve the parties' differences, but that Capstone has refused to do so; and otherwise denies the allegations in Paragraph 28.

29.     MusclePharm states that any amount owed by MusclePharm relates to product that Capstone delivered late, in violation of the Manufacturing Agreement; refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 29.

30.     MusclePharm refers to the referenced agreement for its true and complete terms; states that Paragraph 30 asserts a legal conclusion to which no response is required; states that any failure by MusclePharm to meet any terms of the parties' agreement is due to, and excused by, Capstone's own breaches of that agreement; and otherwise denies the allegations in Paragraph 30.

31.     MusclePharm admits that MusclePharm contributed $2.5 million towards Capstone's expansion; refers to the referenced agreement for its true and complete terms; states that it is without knowledge or information sufficient to form a belief as to the truth of Capstone's allegations concerning the amount it has spent on the expansion of its Tennessee facility; and otherwise denies the allegations in Paragraph 31.

32.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 32.

33.     MusclePharm admits that MusclePharm purchased at least $16.3 million of product in the third quarter of 2015 and at least $12.3 million of product in the fourth quarter of 2015; states that any failure by MusclePharm to meet any terms of the parties' agreement are due to, and excused by, Capstone's own breaches of that agreement; and otherwise denies the allegations in Paragraph 33.

34.     MusclePharm admits that MusclePharm has been forced to seek product from other sources because Capstone has refused to sell product to MusclePharm; states that any failure by MusclePharm to meet any terms of the parties' agreement are due to, and excused by, Capstone's own breaches of that agreement; and otherwise denies the allegations in Paragraph 34.

35.     MusclePharm states that Paragraph 35 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 35.

36.     MusclePharm states that, to the extent MusclePharm refused to accept delivery of any product in Capstone's inventory, such refusal was a direct result of Capstone's breaches of its obligation timely to supply product under the Manufacturing Agreement; and otherwise denies the allegations in Paragraph 36.

37.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the first sentence in Paragraph 37; refers to the communications referenced in Paragraph 37 for their true and correct contents; states that the second sentence in Paragraph 37 contains a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 37.

38.     MusclePharm admits that Capstone informed MusclePharm of its intention to liquidate certain of its inventory; admits that MusclePharm paid for certain product in Capstone's inventory; states that Capstone failed to supply all of the product for which MusclePharm timely provided payment; states that, to the extent MusclePharm refused to accept delivery of any other product in Capstone's inventory, such refusal was a direct result of Capstone's breaches of its obligation timely to supply product under the parties' agreement; and otherwise denies the allegations in Paragraph 38.

39.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39; and otherwise denies the allegations in Paragraph 39.

40.     MusclePharm denies the allegations in Paragraph 40.

41.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41; and otherwise denies the allegations in Paragraph 41.

42.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42; and otherwise denies the allegations in Paragraph 42.

43.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43; and otherwise denies the allegations in Paragraph 43.

44.     MusclePharm states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44; and otherwise denies the allegations in Paragraph 44.

**CLAIMS FOR RELIEF**

**Count 1: Breach of Contract Relating to Arrears**

45.     MusclePharm realleges its responses to Paragraphs 1 through 44 herein.

46.     MusclePharm admits that Capstone manufactured and delivered products to MusclePharm from time to time; and otherwise denies the allegations in Paragraph 46.

47.     MusclePharm states that Paragraph 47 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 47.

48.     MusclePharm states that any amount owed by MusclePharm relates to product that Capstone delivered late, in violation of the Manufacturing Agreement; and otherwise denies the allegations in Paragraph 48.

49.     MusclePharm states that Paragraph 49 asserts a legal conclusion to which no response is required; refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 49.

### Count 2: Breach of Contract Relating to Minimum Volume Requirements

50.     MusclePharm realleges its responses to Paragraphs 1 through 49 herein.

51.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 51.

52.     MusclePharm states that Paragraph 52 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 52.

53.     MusclePharm states that Paragraph 53 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 53.

### Count 3: Breach of Contract Relating to Product Inventory

54.     MusclePharm realleges its responses to Paragraphs 1 through 53 herein.

55.     MusclePharm refers to the communications referenced in Paragraph 55 for their true and correct contents; and otherwise denies the allegations in Paragraph 55.

56.     MusclePharm states that it is without knowledge and information sufficient to form a belief as to the truth of Paragraph 56; and otherwise denies the allegations in Paragraph 56.

57.     MusclePharm refers to the communications referenced in Paragraph 57 for their true and correct contents; and otherwise denies the allegations in Paragraph 57.

58.     MusclePharm states that Paragraph 58 asserts a legal conclusion to which no response is required; and otherwise denies the allegations in Paragraph 58.

59.     MusclePharm admits that Capstone claims that it is seeking the difference between the purported contract price and the purported liquidation price of certain product; and otherwise denies knowledge and information sufficient to form a belief as to the truth of Paragraph 59.

### Count 4: Attorney Fees and Court Costs

60.     MusclePharm refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 60.

61.     MusclePharm states that it attempted to resolve the instant matter through good faith negotiations with Capstone; and otherwise denies the allegations in Paragraph 61.

62.     MusclePharm admits that the parties engaged in mediation, and that such mediation did not produce a settlement; denies knowledge or information sufficient to form a belief as to the truth of Capstone's allegation that it has incurred legal costs and fees; refers to the referenced agreement for its true and complete terms; and otherwise denies the allegations in Paragraph 62.

MusclePharm denies the allegations contained in the "Request for Relief" section, and avers that Capstone is not entitled to any relief whatsoever.

MusclePharm denies any allegation not specifically admitted herein.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Capstone fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, by its own unreasonable conduct, breach of contract, misrepresentations, bad faith, and/or unclean hands.

## THIRD AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, because it fraudulently induced MusclePharm to enter into the agreement from which those claims arise.

## FOURTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, because MusclePharm is entitled to rescission of the agreement from which those claims arise.

## FIFTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, for failure to mitigate any damages allegedly suffered.

## SIXTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, by the doctrines of waiver and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, because its damages, if any, were not caused by any act or failure to act on the part of the MusclePharm, but instead were caused by the acts of, or failure to act by, Capstone.

## EIGHTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, by offset of amounts it owes to MusclePharm.

## NINTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, because Capstone, by its own actions, rendered MusclePharm's performance impossible.

## TENTH AFFIRMATIVE DEFENSE

Capstone's claims are barred, in whole or in part, because Capstone would be unjustly enriched by any recovery in this action.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

MusclePharm gives notice that it intends to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserves its right to amend this Answer to assert any such defenses.

## **COUNTERCLAIMS**

MusclePharm, as and for its counterclaims against Capstone, INI Parent, Inc. ("INI") and Medley Capital Corporation ("Medley Capital"), alleges as follows:

## **PRELIMINARY STATEMENT**

1.      This action arises out of Capstone's fraudulent misrepresentations and breach of its contractual obligations to MusclePharm in connection with the parties' manufacturing agreement.

2.      In late 2013, MusclePharm, a high performance sports nutrition company, entered into an agreement with Capstone, a manufacturer of nutritional products, whereby Capstone agreed to fulfill MusclePharm's production requirements out of Capstone's manufacturing facilities.  Shortly thereafter, Capstone merged with Cornerstone Research and Development, Inc. ("Cornerstone"), a Utah-based manufacturer of nutritional products, and sought to take

advantage of MusclePharm's rapidly increasing sales and revenues by building a larger manufacturing facility in Spring Hill, Tennessee (the "Spring Hill facility"), primarily to service the MusclePharm account.

3.    Critical to the success of the merger with Cornerstone and the new Spring Hill facility was obtaining MusclePharm's commitment to purchase from Capstone an even greater portion of MusclePharm's annual requirements.  To that end, Capstone and its parent, INI, represented to MusclePharm that the parties mutually would benefit from a more substantial relationship, that Capstone would be able to fully service MusclePharm's account, and that neither the integration of Capstone's and Cornerstone's complex manufacturing and distribution systems, nor the transition in manufacturing facilities, would affect Capstone's ability to fully perform under the parties' manufacturing agreement.

4.    Those representations were false when made.  Unbeknownst to MusclePharm at the time, Capstone and INI knew that the integration of the Capstone and Cornerstone systems, combined with the contemporaneous transition of manufacturing facilities, would cause significant interruption to MusclePharm's business and would result in months of delivery delays, lost customers and damaged goodwill that would cost MusclePharm tens of millions of dollars.  Capstone and INI concealed their knowledge of the problems with the Cornerstone systems integration and the transition in facilities in order to induce MusclePharm to enter into an amendment to the parties' manufacturing agreement that would further bind MusclePharm to Capstone (before MusclePharm became aware of the extent of the problems with the transition of facilities).

5.      Thus, in March 2015, MusclePharm -- unaware of the extent of the problems caused by Capstone's system integration and transition in manufacturing facilities -- agreed to amend the parties' manufacturing agreement to bind MusclePharm to substantial minimum purchase requirements and extend the duration of MusclePharm's commitment to Capstone by up to twelve years.  Shortly after Capstone and INI secured MusclePharm's agreement to these new terms, Capstone's delivery delays significantly worsened and began to significantly damage MusclePharm.

6.      Indeed, for the remainder of 2015, Capstone was months late in filling MusclePharm's orders, and when Capstone did deliver products, the deliveries often were short, non-conforming or contained significant volumes of stale product that MusclePharm no longer needed and could not sell.  Capstone repeatedly downplayed these problems, representing to MusclePharm that the late and short deliveries of product would be quickly resolved.  They were not.

7.      Capstone's breach of its contractual obligations to timely supply MusclePharm's requirements significantly damaged MusclePharm.  Capstone's late and short deliveries led to out-of-stocks that cost MusclePharm tens of millions of dollars in sales, as well as lost customers and injury to MusclePharm's brand.  To mitigate the substantial damages caused by Capstone's breach, MusclePharm sought product from alternative sources, but those sources were more expensive than Capstone (causing MusclePharm to spend millions more to cover for Capstone's breaches), and could not produce product fast enough to remedy Capstone's delivery failures.  In addition, Capstone overcharged MusclePharm for the product that it did deliver, ignoring the parties' agreed-upon pricing formula and increasing MusclePharm's costs by millions of dollars.

8.　　In late 2015, Medley Capital -- a lender to Capstone -- acquired an equity interest in INI and Capstone.  At the time, Medley Capital was experiencing financial and legal difficulties, and viewed Capstone as a distressed opportunity from which it could generate immediate income.  To that end, Medley Capital and INI planned to shut down the Spring Hill facility, and to leverage Capstone's $22 million payable from MusclePharm -- a payable that resulted from Capstone's own breaches -- into an opportunity to gain control of MusclePharm and its significant revenue-generating business.  When MusclePharm refused Medley Capital's demand for a security interest in MusclePharm's assets and an equity stake in the company -- a brazen effort to use the payable to acquire an interest in MusclePharm's business -- Medley Capital and INI caused Capstone to cease delivery of products to MusclePharm in breach of the parties' manufacturing agreement.  Medley Capital caused Capstone to cease delivery even though MusclePharm had been current on payments for newly-ordered and timely-delivered products, and had provided assurances of its intent to remain current on new orders going forward.  Medley Capital caused Capstone to assert MusclePharm's outstanding payable as the basis for Capstone's refusal to perform under the parties' agreement, even though the payable was caused by Capstone's own breaches.  Thereafter, Capstone announced -- as Medley Capital had intended all along -- that it was closing the Spring Hill facility, making it impossible for Capstone to fulfill MusclePharm's requirements and to continue to fulfill its obligations to MusclePharm under the Manufacturing Agreement.

9.　　Medley Capital's and INI's heavy-handed control of Capstone caused Capstone to further breach the parties' manufacturing agreement.  Indeed, Medley Capital and INI caused Capstone to refuse to provide MusclePharm with the information and certifications required for

MusclePharm to sell its products in foreign countries, even though MusclePharm has paid Capstone for those products.

10.　　By this action, MusclePharm now seeks to recover the millions of dollars in damages caused by Capstone's, INI's and Medley Capital's misconduct.  Specifically, MusclePharm seeks to recover:  (i) from Capstone and INI, the damages caused by their fraudulent misrepresentations and omissions of material facts, which induced MusclePharm to enter into the 2015 amendment to the parties' manufacturing agreement; (ii) from Capstone, the damages caused by its breach of its obligations under the parties' manufacturing agreement; and (iii) from Medley Capital and INI, the damages caused by their intentional and tortious interference with the parties' manufacturing agreement.

## THE PARTIES

11.　　MusclePharm is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located in Denver, Colorado.

12.　　Capstone is a corporation organized and existing under the laws of the State of Florida, with its principal place of business located in Ogden, Utah.

13.　　INI is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Boston, Massachusetts.  INI is the parent company of Capstone.

14.　　Medley Capital is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in New York, New York.  Medley Capital was a secured lender of INI; since at least December 2015, Medley Capital also has been a significant shareholder of INI.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

16.     This Court has jurisdiction over the parties (i) because MusclePharm and Capstone contractually agreed to submit to the personal jurisdiction of this Court; (ii) Capstone submitted itself to the personal jurisdiction of this Court by bringing the present action; and (iii) third party defendants INI and Medley Capital transact business in the State of Colorado and/or engaged in the tortious acts described herein in the State of Colorado.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because MusclePharm's principal place of business is located in this District.

**STATEMENT OF FACTS**

**A.     MusclePharm, Capstone And The 2013 Manufacturing Agreement.**

18.     Founded in 2008, MusclePharm is a scientifically driven, performance lifestyle company that develops, manufactures, markets and distributes branded nutritional supplements. MusclePharm offers a broad range of products that are marketed and sold in more than 120 countries.  MusclePharm's supplements are manufactured for MusclePharm by third parties under manufacturing agreements.

19.     Capstone, a manufacturer of health and dietary supplements for a variety of customers in the United States and internationally, is one such manufacturer.  Prior to the events complained of herein, Capstone had supplied much of MusclePharm's product since 2013.

20.     The nutritional supplements market is heavily regulated.  For MusclePharm to sell its product in the United States, that product must be manufactured by a company licensed by the U.S. Food and Drug Administration and must undergo strict quality control measures.  Few companies possess the requisite licenses to manufacture nutritional supplements in the United States.

21.     In November 2013, MusclePharm and Capstone entered into a manufacturing agreement whereby Capstone agreed to supply MusclePharm with approximately two-thirds of its required product through 2016 (as amended in March 2015, the "Manufacturing Agreement").

22.     Pursuant to Section 1 of the Manufacturing Agreement, Capstone agreed, among other things, to manufacture and deliver product in the amounts and on the dates listed in MusclePharm's purchase orders, and to deliver such products "within the time both parties agreed upon."

23.     Pursuant to Section 11 of the Manufacturing Agreement, the parties agreed that the delivery date would be included in MusclePharm's purchase orders.  To that end, MusclePharm's purchase orders provide that "[t]ime is of the essence," and state:

> Supplier [*i.e.*, Capstone] agrees to comply with MusclePharm's shipping schedules (as applicable) without any delay.  Shipments must equal the exact amounts identified in the Order and no partial shipments, changes or substitutions in specifications may be made without MusclePharm's prior written consent.  MusclePharm's acceptance of late shipments or partial shipments shall not constitute a waiver of any of MusclePharm's rights to collect damages for goods not delivered or for late delivery.  Supplier shall report to MusclePharm any delays in a schedule immediately as they become known to Supplier.  MusclePharm reserves the right to cancel the Order and effect cover if Supplier cannot comply with the schedule(s) indicated on the Order[.]

24.     Pursuant to Section 6.1 of the Manufacturing Agreement, Capstone warranted that it possessed "the requisite and necessary experience, all necessary licenses and permits,

equipment, facilities and personnel to properly perform the manufacturing services in accordance with the Product Specifications."

25.     Capstone also agreed not to infringe MusclePharm's trademarks.  To that end, Section 9.3 of the Manufacturing Agreement provides that Capstone "shall not use [MusclePharm's] Marks except in packaging and labeling the Products sold to MUSCLEPHARM."

26.     Pursuant to Section 9.7 of the Manufacturing Agreement, Capstone agreed, among other things, to provide MusclePharm with access to the product information and certifications necessary to permit MusclePharm to sell the products manufactured by Capstone to customers in foreign countries.  Capstone's obligations in this regard survive and remain in effect after termination of the Manufacturing Agreement.

**B.     Capstone's Announcement Of Its Plan To Transition Manufacturing Facilities.**

27.     After the parties entered into the Manufacturing Agreement, Capstone manufactured product for MusclePharm from two manufacturing facilities: one near Salt Lake City, Utah, and another in Franklin, Tennessee.  However, unbeknownst to MusclePharm at the time it entered into the Manufacturing Agreement, and contrary to Capstone's representations, Capstone did not possess the capacity and capability to fully perform its obligations under the Manufacturing Agreement.

28.     In April 2014, less than a year after entering into the Manufacturing Agreement, Capstone (then doing business as "Integrity Nutraceuticals") announced a merger with Cornerstone.  A few months later, Capstone announced its plans to move its production of MusclePharm's products to the new, larger Spring Hill facility.

29.     The primary motivation behind the Cornerstone merger and Capstone's decision to build a new facility was its desire to capture a much larger portion of MusclePharm's production requirements.  Indeed, Capstone and its parent, INI, recognized that MusclePharm's business and revenues were growing quickly, and knew that Capstone's lack of capacity would not only prevent Capstone from performing under the Manufacturing Agreement, but would prevent Capstone from securing even larger commitments from MusclePharm in the future. Thus, Capstone and INI embarked on a course of conduct designed to convince MusclePharm to expand the parties' relationship, and to use MusclePharm's increasing sales and revenues to fund that expansion.

30.     To that end, Capstone's Peter Miller and Gregory Horn -- who was also INI's CEO -- represented to MusclePharm that the Cornerstone merger and the transition in facilities would not interfere with -- and, in fact, would improve -- Capstone's service of MusclePharm's account.

31.     That representation was false when made.  Unbeknownst to MusclePharm at the time, Capstone and INI knew that Capstone would not be able to fulfill its obligations under the Manufacturing Agreement during the months-long integration of Capstone's and Cornerstone's various manufacturing and distribution systems, or the months-long transition of manufacturing facilities, and that the Cornerstone system integration and the facility transition would prevent Capstone from timely fulfilling MusclePharm's orders, and would create months of delays and backlogs.

**C.      Capstone's Inducement Of MusclePharm To Enter Into The 2015 Amendment.**

32.     In or about November 2014, Capstone began its integration with Cornerstone, and its transition from its Franklin, Tennessee facility to the Spring Hill facility.

33.     In December 2014, the systems integration and the facility transition began to cause delays and short deliveries of MusclePharm's products.  During this period, Miller and Horn repeatedly assured MusclePharm that the interruption in the supply of product was temporary and quickly would be resolved.  These representations were false when made.

34.     Unbeknownst to MusclePharm at the time, Capstone and INI knew that the delays not only would not be quickly resolved, but would be getting worse.  Capstone and INI knew that they did not have the production capacity to fill MusclePharm's orders, knew that they did not have the capability to seamlessly convert their operations, and knew that they already were experiencing critical problems with product delivery.  However, Capstone and INI concealed their knowledge of the true extent of the problems because they wanted MusclePharm to enter into a new, more substantial series of agreements.  These agreements would further commit MusclePharm to Capstone, would enable Capstone to benefit from MusclePharm's increased production needs, and, as a result, would permit Capstone and INI to enrich themselves at MusclePharm's expense.

35.     Indeed, in or about December 2014, while Capstone was concealing the extent of the problems with the Cornerstone systems integration and the transition of manufacturing facilities, Capstone and INI proposed that MusclePharm amend the Manufacturing Agreement to, among other things, increase MusclePharm's purchase requirements to the greater of $90 million or 90% of MusclePharm's product, and extend the term of the Manufacturing Agreement for up to twelve years.

36.     To that end, Miller and Horn represented that Capstone's new facility would increase its production capacity and would permit Capstone to fill a larger percentage of

MusclePharm's orders. According to Miller and Horn, the two companies would grow together and would reap the benefits from optimizing their supply chains. Capstone's costs for the materials it used to manufacture product for MusclePharm would decrease as the volume of MusclePharm's orders increased, and Capstone would pass on some of those savings to MusclePharm; at the same time, MusclePharm would reduce transaction costs associated with sourcing smaller amounts of product from several different manufacturers. Of course, Capstone and INI failed to disclose to MusclePharm that the manufacturing delays caused by the transition in facilities, combined with delays caused by the Cornerstone system integration, would worsen and would cause millions of dollars in damages to MusclePharm in the upcoming months.

37.     In response, MusclePharm -- being unaware of the extent of the problem with Capstone's manufacturing delays and having no reason to doubt Capstone's sincerity or its commitment to the parties' relationship -- agreed to Capstone's proposed new arrangement.

38.     Thus, on March 2, 2015, MusclePharm entered into an amendment to the Manufacturing Agreement (the "2015 Amendment"). Pursuant to the 2015 Amendment, MusclePharm agreed to meet certain minimum purchase requirements. Specifically, MusclePharm agreed to purchase $67.5 million of product in 2015 (including $19.5 million and $21.5 million in the third and fourth quarters of 2015, respectively); $49 million in the first two quarters of 2016; and, for subsequent quarters, the greater of $90 million of product or 90% of MusclePharm's product requirements over the previous rolling four quarters.

39.     The 2015 Amendment greatly extended the term of the parties' relationship, from December 1, 2016 to March 2, 2022, with three additional two-year automatic renewals at Capstone's sole option. Thus, under the 2015 Amendment, unless Capstone were to elect to

terminate the Manufacturing Agreement, it would be effective until March 2, 2028 -- 13 years

after the 2015 Amendment was executed.

40.     Moreover, pursuant to the 2015 Amendment, MusclePharm also agreed to pay

Capstone $2.5 million to assist with the build-out of the Spring Hill facility, purportedly to be

used by Capstone to fulfill MusclePharm's anticipated requirements under the 2015 Amendment.

41.     The 2015 Amendment contained a number of provisions designed to ensure that

MusclePharm would receive the cost savings and other benefits touted by Capstone.  For

example, Section 19.8 of the Manufacturing Agreement provides:

> Capstone Nutrition shall make all capital investments reasonably necessary in a
> reasonable time period to service MUSCLEPHARM's business growth in
> Products…and shall dedicate manufacturing equipment, line time and priority to
> fulfill MUSCLEPHARM's purchase orders for Products in preference to other
> customer orders.

42.     The 2015 Amendment also set forth the formula by which Capstone would set the

price for the products it manufactured for MusclePharm.  Specifically, Capstone agreed that it

would charge MusclePharm its historical percentage mark-up on its cost of goods sold for the

first $50 million in product, and half of its historical percentage mark-up on any product sold in

excess of $50 million.

**D.      Capstone's Subsequent Failure To Perform.**

43.     Once Capstone obtained MusclePharm's long-term commitment to Capstone and

its new facility, Capstone's failure to perform under the Manufacturing Agreement -- and its

inability to do so for the foreseeable future -- became apparent.  The delivery delays resulting

from the Cornerstone system integration and the transition in facilities increased and, in many

instances, Capstone ceased delivery of product.

44.     In response to complaints and inquiries from MusclePharm, Capstone's representatives falsely represented that its Spring Hill facility was operational, when in fact, Capstone could not operate out of the new facility *at all*, and Capstone's Utah facility did not have the capacity to fill MusclePharm's purchase orders.

45.     Thus, from February through July 2015, Capstone failed to fill millions of dollars worth of orders from MusclePharm.  As Capstone was well aware as a requirements supplier, its failure to timely fill MusclePharm's orders would -- and did -- cause significant damage to MusclePharm.

46.     Indeed, because of the lead time required to manufacture its product, MusclePharm typically orders product well in advance of the anticipated delivery date. MusclePharm calculates these orders by predicting its customers' future needs based on past orders.  Late and short deliveries, therefore, cause a ripple effect:  MusclePharm cannot fulfill its customers' current needs and cannot accurately predict those needs -- and whether it can fulfill them -- in the future.

47.     Thus, when Capstone failed to timely deliver conforming products in the amount requested by MusclePharm, MusclePharm not only lost the millions of dollars in profits it otherwise would have earned from the sale of those products, but it lost customers inasmuch as MusclePharm's customers either were forced to leave their shelves bare or fill their shelves with products from competing suppliers.  And if those customers did not abandon MusclePharm completely, they often reduced their future orders.

48.     Moreover, even when Capstone ultimately delivered products late -- in many instances more than four months late -- MusclePharm could not sell the entire amount it ordered

(because its customers no longer needed the products), and was forced to sell what it could at a discount.

49.     By March 2015, Capstone was significantly behind on MusclePharm's orders.  At that time, Capstone represented to MusclePharm that the delivery delays would be resolved by early May.  However, the delays continued until the end of 2015, causing significant damage to MusclePharm.

50.     Indeed, in April 2015, MusclePharm's logistics manager informed Capstone that one of MusclePharm's customers would be heavily fining MusclePharm for missing shipments, noting that "[t]his is not acceptable and I can't keep this up anymore.… Looks like to me your production quantity isn't going to be enough to catch up."

51.     Later that month, MusclePharm's then-president emailed Capstone about the mounting problems:

> The extended lack of product and slippage of product availability have forced us to address this formally.  We still have 48 out of stocks heading into May.  This has resulted in our inability to fill 30% of our open lines and reduced our shippable revenue by 20% year to date.  We are still unable to get useful updates on products being produced in Utah and are regularly having previously committed availability dates slip.  I'm still committed to the relationship and the plan we have discussed but we have exhausted our customer's patience and need to get caught up in early May as you both previously committed to me.

52.     By mid-May, MusclePharm reported to Capstone that MusclePharm's retail customers were "screaming" at MusclePharm about their lack of product.

53.     Notwithstanding, the delays and short deliveries continued throughout much of 2015, and Capstone was unable to fill all of MusclePharm's outstanding orders until the end of that year.  Worse still, in many instances, Capstone filled back orders by delivering large

quantities of product that MusclePharm and its customers no longer wanted and that could only be sold at a substantial discount, if at all.

54.     As MusclePharm's unfilled purchase orders accumulated, so did MusclePharm's lost sales.  As a direct result of these lost sales, MusclePharm often was unable to pay Capstone for late, short or otherwise nonconforming deliveries.

55.     On June 15, 2015, in response to Capstone's request for payment, MusclePharm's then-president wrote in an email: "The reason we can't catch up on payments sooner is because we have no product to ship to create the required revenue.  It's a bit of a catch 22!  For so long as I continue to have out of stocks, staying current on payments is at risk."  In response, Capstone's representative grudgingly admitted -- while still grossly understating the problem -- that "production was slow in the changeover from one plant to another…."

56.     MusclePharm lost at least $32 million in retail sales as a result of the delays and the short deliveries in 2015.  MusclePharm also spent approximately $4 million in attempts to mitigate its damages by using more expensive alternative suppliers (a particularly difficult process due to applicable regulatory requirements).

57.     Capstone's failure to supply MusclePharm with product harmed MusclePharm's reputation and relationships with both its retailers and consumers, as evidenced by cancelled and reduced orders.  In order to satisfy disappointed customers, MusclePharm discounted product and introduced new promotions for product that it normally would have sold at full price.

58.     Moreover, Capstone's late and non-conforming deliveries, along with MusclePharm's need to cover its requirements with other suppliers, caused MusclePharm to be in arrears on approximately $22 million with respect to the late and non-conforming deliveries, and to fail to fulfill the minimum purchase requirements set forth in the 2015 Amendment.  In short, Capstone's misrepresentations and breaches not only caused significant damage to MusclePharm, they caused the very losses about which Capstone now complains in this action.

59.     Compounding the substantial damages caused by its late and non-conforming deliveries, Capstone also overcharged MusclePharm for the product that it delivered.  As noted above, Capstone agreed to charge no more than its historical percentage mark-up on its cost of goods sold.  However, Capstone charged MusclePharm prices that regularly exceeded that amount.

**E.     INI's And Medley Capital's Interference With The Manufacturing Agreement.**

60.     In late 2015, Medley Capital acquired a significant interest in Capstone through Capstone's parent, INI.  Medley Capital is a private equity firm that touts its ability to generate current income and capital appreciation by lending directly to privately-held middle market companies.

61.     At the time, Medley Capital was in financial distress and was facing a number of legal problems.  Medley Capital was named in several lawsuits, including a $100 million suit alleging that Medley Capital took control of a company and directed it to breach its contracts, just as it did here.  Medley Capital was also forced to hand over management of two of its funds to another private equity group, and received a subpoena in connection with the New York Department of Financial Services' investigation of the payday lending industry.

62.     Medley Capital, which already owned a portion of INI's debt, viewed Capstone as a distressed opportunity from which it could generate immediate income. To that end, Medley Capital and INI developed a plan to shut down Capstone's Spring Hill facility, and to leverage the $22 million payable from MusclePharm -- a payable created by Capstone's own breaches -- into an opportunity to gain control of MusclePharm and its significant revenue-generating business.

63.     Thus, at a January 2016 meeting with MusclePharm, Capstone executives, and other Capstone investors, Medley Capital's James Feeney demanded that MusclePharm issue Capstone a promissory note convertible into equity and grant Capstone a security interest in all of MusclePharm's assets. When MusclePharm refused, Medley Capital and INI caused Capstone to cease delivery of products to MusclePharm, even though MusclePharm had been current on payments for newly-ordered and timely delivered products, and had provided assurances of its intent to remain current on new orders going forward.

64.     Capstone attempted to justify its refusal to continue to fulfill MusclePharm's requirements in accordance with the Manufacturing Agreement by asserting that its performance was excused by the outstanding payable, even though that payable solely related to -- and was caused by -- Capstone's prior breaches.

65.     Thereafter, Capstone announced -- as Medley Capital and INI had intended all along -- that it was closing the Spring Hill facility, making it impossible for Capstone to fulfill MusclePharm's requirements and to continue to fulfill its obligations to MusclePharm under the Manufacturing Agreement.

66.     Medley Capital and INI then caused Capstone to further breach the Manufacturing Agreement.  Indeed, in or about April 2016, Capstone agreed to deliver certain product in exchange for approximately $885,000.  Although MusclePharm paid the full amount, Capstone refused to deliver approximately $35,000 in product.  Capstone then sold the product it did not deliver, in addition to other MusclePharm product, directly to third parties, wrongfully applying MusclePharm's trademarks to such products in direct violation of the Manufacturing Agreement.

67.     Medley Capital and INI also caused Capstone to further damage MusclePharm by refusing to provide MusclePharm with the information and certifications required for MusclePharm to sell its products in foreign countries, even though MusclePharm has paid Capstone for those products.

**COUNT I**
**(Fraudulent Inducement)**
**(Against Capstone and INI)**

68.     MusclePharm realleges paragraphs 1 through 67 as if fully set forth herein.

69.     As set forth herein, Capstone and INI made the following misrepresentations and omissions of material fact, among others:

(a) Capstone and INI represented to MusclePharm that the Cornerstone merger and the transition in facilities would not interfere with -- and in fact, would improve -- Capstone's service of MusclePharm's account;

(b) Capstone and INI represented that Capstone's new facility would increase its production capacity and would permit Capstone to fill a larger percentage of MusclePharm's orders;

(c) Capstone and INI represented that Capstone had the production capacity to fill MusclePharm's orders;

(d) Capstone and INI represented that Capstone had the capability to seamlessly convert its operations after the merger with Cornerstone, and that the merger would improve Capstone's service of MusclePharm's account;

(e) Capstone and INI failed to disclose to MusclePharm that Capstone already was experiencing critical problems with product delivery prior to MusclePharm's execution of the 2015 Amendment; and

(f) Capstone and INI failed to disclose to MusclePharm that the manufacturing delays caused by the Cornerstone merger and the transition in facilities not only would not be quickly resolved, but would worsen and would cause millions of dollars in damages to MusclePharm.

70.     Capstone and INI made these misrepresentations and omissions, which were independent of its contractual obligations, with the intention that MusclePharm rely on them by entering into the 2015 Amendment.

71.     MusclePharm reasonably relied on Capstone's and INI's misrepresentations and omissions of material fact by entering into the 2015 Amendment.

72.     Capstone's and INI's conduct was wrongful, without justification or excuse and contrary to generally accepted standards of morality.  Moreover, Capstone's and INI's acts and omissions were committed with actual malice and/or a wanton and willful disregard of MusclePharm's rights.  In light of the relationship between the parties, Capstone's and INI's conduct was unconscionable and unjustifiable.

73.     As a result of Capstone's and INI's conduct, MusclePharm is entitled to rescission of the 2015 Amendment, and has also been damaged in an amount to be determined at trial.

## COUNT II
### (Negligent Misrepresentation)
### (Against Capstone)

74.     MusclePharm realleges paragraphs 1 through 67 and 69 as if fully set forth herein.

75.     Capstone and INI had a duty to accurately convey to MusclePharm all material information relating to, among other things, its manufacturing capabilities and its true knowledge concerning the problems caused by the Cornerstone merger and the facility transition.  Moreover, having undertaken to provide material information to MusclePharm, Capstone and INI were under a duty to provide complete and truthful information. Notwithstanding, Capstone and INI did not exercise reasonable care or competence in communicating material information to MusclePharm.

76.     Capstone and INI breached their duty to accurately convey all material information by making the misrepresentations and omissions of material fact described herein.

77.     As to the omissions of material fact, Capstone and INI had a duty to fully and candidly disclose those facts as a result of, among other things, their superior knowledge concerning Capstone's manufacturing capabilities and the problems caused by the Cornerstone merger and the facility transition, coupled with the knowledge that MusclePharm was acting upon mistaken information.

78.     In addition, Capstone's and INI's conduct in making these misrepresentations and omissions of material facts amounted to gross negligence.  Capstone's and INI's misrepresentations and omissions of material facts involved an extreme degree of risk, considering the probability and magnitude of the potential harm to MusclePharm.  Furthermore,

Capstone and INI had actual, subjective awareness of this risk, but nevertheless proceeded with conscious indifference to MusclePharm's rights and welfare.

79.     MusclePharm justifiably relied on Capstone's and INI's misrepresentations and omissions of material fact to its detriment by, among other things, entering into the 2015 Amendment.

80.     Capstone's and INI's conduct was wrongful, without justification or excuse and contrary to generally accepted standards of morality.  Moreover, Capstone's and INI's acts and omissions were committed with actual malice and/or a wanton and willful disregard of MusclePharm's rights.  In light of the relationship between the parties, Capstone's and INI's conduct was unconscionable and unjustifiable.

81.     As a result of Capstone's and INI's conduct, MusclePharm is entitled to rescission of the 2015 Amendment, and has also been damaged in an amount to be determined at trial.

**COUNT III**
**(Breach of Contract)**
**(Against Capstone)**

82.     MusclePharm realleges paragraphs 1 through 67 as if fully set forth herein.

83.     The Manufacturing Agreement constitutes a valid and binding contract.

84.     Capstone materially breached the Manufacturing Agreement by, among other things:

> (a) breaching its representation that it had the requisite manufacturing capabilities to supply MusclePharm pursuant to the terms of the Manufacturing Agreement;

> (b) failing to make all capital investments necessary to perform its obligations;

> (c) failing to timely deliver product in accordance with MusclePharm's purchase orders and the terms of the Manufacturing Agreement;

(d) refusing to deliver product in accordance with MusclePharm's purchase orders and the terms of the Manufacturing Agreement;

(e) selling MusclePharm-branded products to third parties in violation of MusclePharm's contractual and other trademark rights;

(f) refusing to provide information and certifications necessary for MusclePharm to sell its products in other countries; and

(g) charging MusclePharm a price that exceeded the formula mandated by the terms of the Manufacturing Agreement.

85. MusclePharm performed all of its obligations under the Manufacturing Agreement, except as it was prevented and/or excused from performance by Capstone's material breaches.

86. As a result of Capstone's breaches, MusclePharm has been damaged in an amount to be determined at trial.

**COUNT IV**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Capstone)**

87. MusclePharm realleges paragraphs 1 through 67 as if fully set forth herein.

88. A covenant of good faith and fair dealing is implied in the Manufacturing Agreement.

89. Capstone breached the implied covenant of good faith and fair dealing by, among other thing, exercising in bad faith the discretion granted to Capstone in the Manufacturing Agreement concerning delivery of products and the provision of information and certifications necessary for the sale of MusclePharm's products, all in order to deprive MusclePharm of its bargained-for exchange.

90.     MusclePharm performed all of its obligations under the Manufacturing Agreement, except as it was prevented and/or excused from performance by Capstone's material breaches.

91.     As a result of Capstone's breaches, MusclePharm has been damaged in an amount to be determined at trial.

**COUNT V**
**(Intentional Interference with Contract)**
**(Against INI and Medley Capital)**

92.     MusclePharm realleges paragraphs 1 through 67 as if fully set forth herein.

93.     The Manufacturing Agreement constitutes a valid and binding contract between MusclePharm and Capstone.

94.     At all material times, Medley Capital and INI were aware of the existence of the Manufacturing Agreement.

95.     Medley Capital and INI intentionally and improperly interfered with the Manufacturing Agreement by, among other things, causing Capstone (i) to cease supplying MusclePharm with product, notwithstanding MusclePharm's timely payment for such product, (ii) to cease operations at the Spring Hill facility, rendering Capstone unable to fulfill its obligation under the Manufacturing Agreement, (iii) to sell MusclePharm's branded and trademarked product to third parties, (iv) to refuse to provide information and certifications necessary for MusclePharm to sell its products in other countries, and (v) to overcharge MusclePharm for its product, in violation of the Manufacturing Agreement's pricing terms. Each of these actions breached Capstone's obligations under the Manufacturing Agreement.

96.     Capstone's and INI's conduct was wrongful, without justification or excuse and contrary to generally accepted standards of morality.  Moreover, Capstone's and INI's acts and

omissions were committed with actual malice and/or a wanton and willful disregard of MusclePharm's rights. In light of the relationship between the parties, Capstone's and INI's conduct was unconscionable and unjustifiable.

97. As a result of Medley Capital's and INI's conduct, MusclePharm has been damaged in an amount to be determined at trial.

WHEREFORE, MusclePharm demands judgment granting the following relief:

     (a) on Count I, against Capstone and INI, rescission of the Manufacturing Agreement and compensatory and punitive damages in an amount to be determined at trial;

     (b) on Count II, against Capstone and INI, rescission of the Manufacturing Agreement and compensatory and punitive damages in an amount to be determined at trial;

     (c) on Count III, against Capstone, compensatory damages in an amount to be determined at trial;

     (d) on Count IV, against Capstone, compensatory damages in an amount to be determined at trial;

     (e) on Count V, against Medley Capital and INI, compensatory and punitive damages in an amount to be determined at trial;

     (f) on all counts, attorneys' fees and court costs in an amount to be determined; and

     (g) such further relief as the Court deems just and proper.

Pursuant to Fed. R. Civ. P. 38, MusclePharm hereby requests trial by jury on all claims and issues so triable.

Dated: June 21, 2016

Respectfully Submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:     *s/ Richard B. Benenson*

Richard B. Benenson, #32566
410 Seventeenth Street, Ste 2200
Denver, Colorado 80202
Phone:  303.223.1100
Fax:  303.223.1111
Email:  rbenenson@bhfs.com

Jonathan E. Minsker
Gavin D. Schryver
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019
Phone: 212.506.1891
Fax: 212.835.5291
Email: JMinsker@kasowitz.com
        GSchryver@kasowitz.com

*Attorneys for Defendant/Counterclaim-Plaintiff*
*MusclePharm Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2016, a true and correct copy of the foregoing **MUSCLEPHARM CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** was filed with the Clerk of Court via CM/ECF, which will send notification of such filing to the following:

David L. Yohai
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Phone: 212.310.8000
Fax: 212.310.8007
Email: David.Yohai@weil.com

*Attorneys for Plaintiff F.H.G. Corporation d/b/a*
*Capstone Nutrition*

<u>*s/ Allecia Cavallaro*</u>
 Allecia Cavallaro